J-S79011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL LANE | |
| Appellant | No. 2494 EDA 2015 |

Appeal from the Judgment of Sentence December 16, 2003
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0003487-2002

BEFORE: GANTMAN, P.J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED NOVEMBER 30, 2016**

Appellant, Michael Lane, appeals *nunc pro tunc* from the judgment of sentence entered in the Lehigh County Court of Common Pleas, following his jury trial convictions for three counts of robbery, two counts of aggravated assault, and possessing instruments of crime.[1] We affirm.

The trial court fully set forth the relevant facts and procedural history of this case in its opinion. Therefore, we have no reason to restate them.

Appellant raises three issues for our review:

> DID THE APPLICATION OF 42 PA.C.S.A. § 9714(A)(2) (SENTENCES FOR SECOND AND SUBSEQUENT OFFENSES) VIOLATE APPELLANT'S RIGHTS UNDER THE UNITED STATES AND PENNSYLVANIA CONSTITUTIONS, AS DEFINED IN ***ALLEYNE V. UNITED STATES***, [___ U.S.

---

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(i), (ii), (iii); 2702(a)(1), (a)(4); 907.

___,] 133 S.CT. 2151, 186 L.ED.2D 314 (2013).

DID THE [TRIAL] COURT ERR WHEN IT EXCLUDED APPELLANT FROM THE COURTROOM DURING THE TRIAL AND PRECLUDED APPELLANT FROM TESTIFYING DESPITE APPELLANT'S CLEAR DESIRE AND INTENTION TO TESTIFY AT TRIAL?

DID THE [TRIAL] COURT ERR WHEN IT PERMITTED THE COMMONWEALTH TO INTRODUCE EVIDENCE OF APPELLANT'S RELIGION (ISLAM) AT TRIAL?

(Appellant's Brief at 4).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Robert L. Steinberg, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Supplemental Trial Court Opinion, filed August 27, 2015, at 13-22; 26-27) (finding: **(1)** court may impose sentence of life imprisonment, under 42 Pa.C.S.A. § 9714(a)(2), where, at time of commission of current offense, defendant had been previously convicted of two or more crimes of violence, if court decides sentence of 25 years' imprisonment is insufficient to protect public; Appellant has two prior convictions for separate murders occurring in 1972 and 1978, constituting "crimes of violence" for purposes of Section 9714; Appellant is prototypical "three strikes" offender; Appellant also has prior conviction for aggravated assault; Appellant's prior aggravated assault conviction left that victim paralyzed; Appellant has demonstrated through persistent criminal behavior

- 2 -

that he is not susceptible to reform; Appellant's prior murder and aggravated assault convictions support court's imposition of life imprisonment for current offense; Supreme Court's holding in **Alleyne** does **not** apply to fact of prior conviction;[2] **(2)** Appellant's behavior throughout trial was disruptive and obstreperous; Appellant indulged in constant outbursts and unwillingness to adhere to courtroom decorum; court repeatedly warned Appellant about his behavior, removed him from courtroom, and permitted him to return to courtroom after reforming behavior, to provide Appellant with fair trial; Appellant did everything in his power to sabotage trial; Appellant's interference was intentional; despite multiple warnings from court and counsel, Appellant continued to disrupt proceedings and was removed from court each day; on final day of trial, Appellant was belligerent within fifteen minutes of start of trial, requiring removal; Appellant refused to view or participate in proceedings from adjacent room set up for that purpose; court discussed with Appellant that he might lose right to testify because of his disruptions; Appellant's behavior contradicted his assertion that he was ready, willing, and able to testify;[3]

---

[2] On August 4, 2016, the Pennsylvania Supreme Court granted allowance of appeal in **Commonwealth v. Bragg**, 133 A.3d 328 (Pa.Super. 2016), *appeal granted*, ___ Pa. ___, 143 A.3d 890 (2016), to decide whether Section 9714 is unconstitutional as currently drafted.

[3] Appellant admits the court accurately described in its supplemental opinion Appellant's conduct as reflected in the record. (**See** Appellant's Brief at 17.)

Appellant forfeited right to testify based on his actions; **(3)** fact that Appellant was Muslim was relevant; during cross-examination of Investigator Felchock, defense counsel emphasized that name on tag in clothes secured from Appellant upon his arrest (Mikal Lake) differed slightly from Appellant's name; defense counsel sought to cast doubt on whether clothes secured and analyzed actually belonged to Appellant; Commonwealth then asked Investigator several questions about Appellant's identity; Investigator testified that he questioned Appellant about discrepancy on name in clothes and name on his driver's license, and Appellant explained that "Mikal" was his Muslim name; references to Appellant's religion were minor;[4] Investigator's explanation was relevant in light of defense counsel's questions to establish Appellant's ownership of clothing; Appellant suffered no undue prejudice).[5] Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

---

[4] If anything, Appellant exacerbated the references to his religion when he interrupted the Investigator's testimony. Appellant's outburst persisted, ultimately leading to his removal from the courtroom.

[5] Appellant also challenges the prosecutor's references to God during opening and closing statements. Appellant did not object to counsel's remarks, so this claim is waived. **See Commonwealth v. Ali**, 608 Pa. 71, 10 A.3d 282 (2010) (stating failure to raise contemporaneous objection to prosecutor's comment at trial waives claim of error arising from comment).

## IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
                                :
          vs.                   : NO.  CR-3487-2002
                                : Superior Court No.:  2494 EDA 2015
MICHAEL LANE                    :

* * * * *

Appearances:

        Heather Gallagher, Senior Deputy District Attorney
           For the Commonwealth

        Gavin Holihan, Esquire
           For the Appellant

* * * * *

## SUPPLEMENTAL OPINION

**Robert L. Steinberg, Judge:**


On December 4, 2013, the Superior Court remanded this matter and directed the

appellant to file a Pa.R.A.P. 1925(b) Statement "within twenty-one (21) days after remand" to be

followed by this Court's supplemental 1925(a) Opinion.[2]  Counsel for the appellant filed a

premature "Concise Statement Of Errors Complained Of On Appeal Pursuant To Pennsylvania

Rule of Appellate Procedure 1925(b)" (hereinafter Concise Statement) on December 31, 2013.[3]

A second Concise Statement was filed on June 11, 2014, which was after the Commonwealth's

---

[2] See Commonwealth v. Lane, 81 A.3d 974 (Pa.Super. 2013).
[3] The appellant filed a Concise Statement on December 31, 2013,and then a second Concise Statement on June 11, 2014.  This Court filed its Pa.R.A.P. 1925(a) opinion on June 17, 2014.  On June 26, 2014, the Superior Court returned the "unified record" to the Lehigh County Clerk of Judicial Records.

Petition for Allowance of Appeal was denied.[4] This Court then filed its Pa.R.A.P. 1925(a) opinion on June 17, 2014. However, on June 26, 2014, the Superior Court returned the record to the Lehigh County Clerk of Judicial Records.

The Superior Court had ordered the "reinstatement of Appellant's direct appeal rights nunc pro tunc."[5] However, some procedural confusion existed concerning the creation of a new Superior Court number, and a new Notice of Appeal was not filed by PCRA counsel until August 13, 2015. This Opinion will address the issues raised as if this is a direct appeal.[6]

## Background

The crime underlying the present conviction occurred on June 19, 2002, less than two years after the appellant's release from a lengthy period of incarceration in state prison. On that afternoon, the appellant entered the Park Mart, a small gas station and convenience store, located at 824 W. Broad Street, Bethlehem, in Lehigh County, Pennsylvania. He demanded that the victim, Bhavna Perikh, who was working alone in the store, give him money from the various registers. To that end, he had attempted, unsuccessfully, to conceal his face, and he brandished a large knife, at times thrusting it at the victim. In fact, upon entering the store and finding the victim, the appellant forcefully took the telephone that the victim was holding and stabbed the victim's left hand.[7] The appellant then pulled Ms. Perikh by the shirt to the front of the store to the register area.[8] Ms. Perikh anxiously attempted to comply with the appellant's demands despite the fact that she was bleeding profusely, putting as much money as she could

---

[4] See Commonwealth v. Lane, 3 MAL 2014 (Pa. May 15, 2014).

[5] Lane, 81 A.3d at 981.

[6] Many of the issues raised were addressed by the Superior Court in its opinion dated July 12, 2006. See Commonwealth v. Lane, No. 1602 EDA 2004 (Pa.Super. July 12, 2006). The opinion by Judge Tamilia, which affirmed the judgment of sentence, was later withdrawn when an application for reargument was granted. Commonwealth v. Lane, No. 1602 EDA 2004 (Pa.Super. September 22, 2006).

[7] Notes of Testimony, Trial (hereinafter N.T.T.), August 12, 2003, pp. 62-63.

[8] Id. at p. 63.

2

into a plastic grocery-type bag.[9] Nevertheless, the appellant demanded that the victim "hurry up," and ultimately cut her right hand as well, severing several tendons.[10] The victim continued to attempt to do as instructed by the appellant, but had great difficulty. Ultimately, the appellant took the bag of money and also put additional money in his left front pants pocket.[11]

After obtaining less than three hundred dollars ($300), the appellant fled from the store. He was observed by several alert bystanders loping down the street carrying a white plastic bag and what appeared to be a knife.[12] The witnesses, in turn, flagged down Sergeant David Cimera, who was driving through the area in a marked police vehicle.[13] They informed the officer of the situation and directed him to the area where the appellant had run. Sergeant Cimera chased the appellant, and ultimately, observed him start a white Chrysler vehicle, look up at him, put the vehicle in gear, make a U-turn, and drive away rapidly.[14] Sergeant Cimera relayed the vehicle description and registration information to police dispatch, and the car was traced to the appellant.[15] After the appellant fled the area, Sergeant Cimera noticed money covered in blood laying in the street in the area where the appellant's car had been parked, specifically, in the area near the driver's door.[16]

Surveillance was then set up near the appellant's home located at 1342 Butler Street in Easton, Pennsylvania. He was arrested later that evening in Easton in the area of 17th and Northampton Streets. Shortly after the arrest, Sergeant Cimera arrived at the scene and positively identified him as the person he had observed earlier that day entering the white

---

[9] N.T.T., August 12, 2003, pp. 63-70.
[10] Id. at pp. 66-72.
[11] Id. at pp. 65-79.
[12] Id. at pp. 146-147.
[13] Id. at pp. 153, 198.
[14] N.T.T., August 13, 2003, p. 21.
[15] Id. at pp. 23, 28.
[16] Id. at pp. 27-29.

3

Chrysler and speeding away from the vicinity of the robbery.[17] The appellant's clothing was secured at Lehigh County Prison and, pursuant to a search warrant, was later released to Investigator Scott Felchock.[18] The clothing was issued from the appellant's employer and bore the name "Mikal Lake." The clothing was analyzed and tested, and the victim's blood was discovered on the appellant's pants, specifically, in the area of the left front pants pocket.[19]

A photographic array was also prepared that contained photos of six different individuals, including the appellant, who shared similar traits and characteristics. The array was shown to the victim, from which she immediately identified the appellant as the person who had robbed the Park Mart and injured her hands.[20] In addition, the photo array was also shown to one of the witnesses, Darren Smith, who immediately selected the appellant as the person he had seen fleeing the Park Mart.[21]

Jury selection commenced on August 11, 2003.[22] Following the selection of a jury, the jurors were released in order to address issues of concern to the appellant. The appellant was permitted to speak, but was instructed that he would generally only be permitted to speak through his attorney.[23]

The appellant refused to heed to any instructions and was disruptive throughout the trial. During the first day of testimony, while the victim was reviewing photographs of her injuries, the appellant became agitated because he believed that the District Attorney was displaying pictures to the jury prior to them being admitted into evidence, which occurred

---

[17] N.T.T., August 13, 2003, pp. 41-43.
[18] Id. at pp. 161-167.
[19] Id. at p. 267.
[20] Id. at p. 227.
[21] Id. at p. 229.
[22] The appellant refused to enter a plea of not guilty on the Information.
[23] N.T.T., August 11, 2003, p. 42.

4

moments later.[24] Instead of bringing the issue to his attorney's attention, the appellant began to directly address the Court.[25] The appellant was instructed not to speak out in such a manner, and was told "You're going to have to keep it down".[26] Following that admonition, the appellant's concerns were addressed.

After the lunch recess, defense counsel had the opportunity to cross-examine the victim. When counsel concluded his questioning, the appellant again became upset and began to speak directly to the Court stating, "Your honor? Whoa! Whoa! Whoa!"[27] The appellant claimed that he needed to consult with his attorney because counsel was, according to the appellant, "selling me out."[28] The Court admonished the appellant that he could not "just talk when you want to talk."[29] Nevertheless, this Court recessed briefly to give the appellant the opportunity to speak with counsel. During that recess, the Court gave the appellant a further warning:

> Okay. Mr. Lane, I'm going to tell you this once. I'll give you the opportunity to consult with your attorney. If you're going to talk when you want to talk, I'll have you removed from the courtroom. You're welcome to stay in the courtroom or you can leave. I'll give you some courtesies. But, at the same time, if you're going to talk when you want to talk, then you're going to be removed from the courtroom.
> ****
> I'm giving you some courtesies.
> But if you're going to talk whenever you want, I'm going to remove you. You can sit outside, down in the bullpen, while trial goes on. It doesn't matter.
> ****
> So you'll get the opportunity to consult with Mr. Nelthropp prior to the end of this cross-examination. I'm going to give you that opportunity now. But you're not going to talk

---

[24] N.T.T., August 12, 2003, p. 95.
[25] Id. at p. 93.
[26] Id. at pp. 93-94.
[27] Id. at p. 133.
[28] Id.
[29] Id.

5

to me just when you feel like during the course of the trial . . . . But this is a courtroom. It's a court of law and I'm going to conduct it as such.[30]

The appellant's response to this Court's instructions was, "You might as well put a mother fucker rope around my neck."[31]

This Court, in choosing to overlook the appellant's comments, had a further discussion with counsel during the recess:

> [W]e'll give Mr. Lane the opportunity to remain in the courtroom. However, if he continues to speak when he wants to, then we'll have him removed from the courtroom and we'll proceed in that fashion.
> ****
> One does not profit from their own misdeeds. And if Mr. Lane . . . is going to act in that fashion, then Mr. Lane will have to suffer the consequences of it.
> This is a court of law. He doesn't get to speak when he wants to . . . . [Y]ou should inform him that if he chooses to testify, he'll have the opportunity to explain his version of the events. But, at the same time, you'll have the opportunity to present the case as you, as counsel, feel is appropriate to do. But you should consult with your client, okay?[32]

The appellant at that time elected to remain in the Courtroom for the trial. The Court reviewed with him what had been discussed with trial counsel about consulting with him and also warned the appellant:

> So, I will again, try to accommodate you, Mr. Lane, as best I can.
> However, I will say to you, don't speak to me during open court. I'll give you every opportunity to speak to me when we take our breaks like we're speaking now. But I'm not going to let you speak just when you want to. The sheriffs will be instructed to remove you. So I don't want to do that. I will try my best not to do that. But you have to also understand that this is a court of law.[33]

---

[30] N.T.T., August 12, 2003, pp. 134-135.
[31] Id. at p. 136.
[32] Id. at pp. 137-138.
[33] Id. at pp. 140-141.

6

Following lengthy discussions with and several warnings to the appellant regarding appropriate courtroom behavior, together with further consultation with his attorney, the jurors were brought back into the courtroom. Two witnesses later, but before the witness could take the stand, the appellant again began to speak out, and the following exchange occurred:

> Mr. Lane: Your Honor –
>
> The Court: No.
>
> Mr. Lane: I can't get no fair trial. Man, this ain't no way for white people are going to find me not guilty. Man, there's no way.
>
> Mr. Shore: Objection.
>
> Mr. Lane: This lawyer's not doing what he's supposed to do. No way in the world. Their mind is already made up, the fact I'm already black.
>
> The Court: Do you want to stay, Mr. Lane?
>
> Mr. Lane: I can't get a fair trial. Look at them. My lawyer is not doing a proper trial. I can't get a proper –
>
> The Court: Do you want to stay or do you want to leave?
>
> Mr. Lane: Do you mean –
>
> The Court: Do you want to stay or do you want to leave?
>
> Mr. Lane: I'm not saying either/or. There ain't twelve white people going to find me not guilty. My lawyer's not doing a proper job. Man, do you know what I'm saying?
>
> The Court: You're going to have to – The record should reflect that Mr. Lane is not listening to what I'm telling him to do. You can stay and sit quietly. You'll be given an opportunity –
>
> Mr. Lane: My lawyer is – is sitting here selling me out. And I'm not going to be quiet.

7

The Court: Then you're going to have – have to leave.

Mr. Lane: If that's your will, that's your will.

The Court: Then you'll have to leave.

Mr. Lane: White people ain't going to find me not guilty. I can't get no fair trial here. I might as well be in Eagle County.[34]

It was apparent that the appellant intended to either sabotage the trial or create appeal issues because the prior witness, Phillip Tacket, did not even identify him. Defense counsel found the appellant's conduct vexing, and said, "I'm having a very difficult time trying to proceed with this case with his outbursts and the statements he's making."[35]

The appellant was removed from the courtroom, which prompted a discussion between the Court and attorneys outside the hearing of the jury. It was reiterated that the appellant would not be permitted to continually disrupt the trial. "You don't get a mistrial when you sabotage your own proceedings."[36] Both Counsel were informed that the appellant would be consistently returned to the courtroom to determine if he would like to participate in his trial.[37] Another short recess was taken and trial counsel was directed to consult with the appellant regarding appropriate behavior and the possibility of returning to the courtroom.[38] If the appellant declined to return to the courtroom, the sheriff was instructed to periodically ask the appellant if he desired to return to the courtroom and participate in his trial.[39]

The appellant refused to speak with counsel, but he also made remarks that were interpreted by the sheriff to be threats against his attorney. Ultimately, the appellant even

---

[34] N.T.T., August 12, 2003, pp. 166-167. It is unclear if the appellant was referring to Eagle, Pennsylvania, which is located in Upper Uwchlan Township, Chester County, or New Eagle, which is a borough in Washington County.
[35] Id. at p. 170.
[36] Id. at pp. 168-171.
[37] Id. at pp. 168-169.
[38] Id. at p. 172.
[39] Id.

8

refused to speak to the sheriff sent to ask him about returning to his trial.[40] At the conclusion of the day, the Court made arrangements to have video equipment set up so that the appellant could watch the trial in an adjacent room.[41] Additionally, the last witness of the day was asked to return, so throughout the evening hours, defense counsel could review his testimony with the appellant in the event additional cross-examination was necessary.[42] Finally, a cautionary instruction was given to the jury.[43]

At the beginning of the second day of trial, the Court attempted to ascertain whether the appellant wished to remain in the courtroom. While the appellant would not commit to behaving himself, he expressed a desire to stay and participate.[44] The appellant was permitted to stay, and the morning proceeded largely without interruption.[45] However, in the early afternoon, during the testimony of Investigator Scott Felchock, the police prosecutor, the appellant again became agitated and began to disrupt the trial.[46] The appellant was asked to settle down and was told to cease his disruptive behavior, or else he would be removed.[47] The appellant kept speaking, in disregard to this Court's warning. As a result, the appellant was again removed from the courtroom, and as this occurred, he yelled, "I can't get no fair trial here, man. I can't get no fair trial."[48] The appellant refused to take advantage of the previously arranged video feed in the adjacent room and demanded to be taken back to the prison.[49]

---

[40] N.T.T., August 12, 2003, pp. 177, 187, 245-246.
[41] Id. at pp. 174, 241-245.
[42] Id. at p. 190.
[43] Id. at pp. 191-193.
[44] N.T.T., August 13, 2003, pp. 6-12.
[45] Id. at pp. 74, 84-85, 145.
[46] Id. at p. 156.
[47] Id. at pp. 157-158.
[48] Id. at p. 159.
[49] Id. at pp. 241-246.

9

Once testimony had been completed for the day, a meeting with counsel was held.[50] Defense counsel was instructed to speak with his client about participating in the trial. In fact, this Court commented that if the appellant planned to testify, he could do so the next day, provided that he conducted himself appropriately.[51] This Court noted that "I will not permit his conduct again."[52] The Court further commented that it had never observed a defendant who conducted himself in such an irresponsible and disrespectful manner in his six (6) years on the bench and in more than twenty (20) years of practice.[53]

The third and final day of trial began with additional testimony from Investigator Felchock, with the defendant present in the courtroom. At the conclusion of Investigator Felchock's testimony, defense counsel asked several questions on cross-examination, consulted with his client, and then asked additional questions. However, the appellant, apparently dissatisfied with his attorney's questions, again began to directly address the Court.[54] The Court attempted to calm the appellant, who was speaking very loudly and being extremely disruptive. The appellant then stated, "I want to testify."[55] The Court responded, "Then, you will get an opportunity to testify. Otherwise, you will leave the room."[56] Nevertheless, the appellant continued to obstinately defy the Court and interrupt the proceedings. Both the Court and defense counsel cautioned the appellant to be quiet and reform his behavior.[57] However, the appellant persisted and was ultimately removed from the courtroom within the first fifteen

---

[50] N.T.T., August 13, 2003, pp. 310-313.
[51] Id. at p. 312.
[52] Id.
[53] Id.
[54] N.T.T., August 14, 2003, p. 322.
[55] Id. at p. 323.
[56] Id.
[57] Id. at p. 324.

10

minutes of Court.[58] As he had the previous day, the appellant refused to view and participate in the proceedings from the adjacent room that had been specifically set up for that purpose.[59]

Defense counsel presented several witnesses on behalf of the appellant and then rested his case. Closing arguments were presented, as well as jury instructions. Following deliberations, the jury found the appellant guilty of Robbery[60] (3 counts), Aggravated Assault[61] (2 counts), and Possessing an Instrument of Crime.[62]

## Sentencing

Prior to sentencing, the Commonwealth filed a "Notice of Commonwealth's Intention to Proceed With Mandatory Sentencing Pursuant to 42 Pa.C.S. § 9714". On October 24, 2003, the Commonwealth filed an amended notice alerting the appellant of its intention to seek a sentence of life imprisonment without parole.

On December 16, 2003, at the conclusion of the sentencing hearing, the appellant was sentenced to life without parole. The Commonwealth, at the hearing, presented testimony regarding the appellant's extensive, violent prior criminal history. In 1972, the appellant was involved in a homicide in Philadelphia. The incident apparently involved two rival gangs, including one with which the appellant was affiliated. He and other gang members fired shots at the rival gang, but instead, an innocent bystander, David Autry, who was fourteen (14) years old, was struck and killed. Another bystander was hit by a bullet, but recovered from his injuries. The appellant entered a guilty plea to the murder in June of 1972.[63]

---

[58] N.T.T., August 14, 2003, p. 325.
[59] Id.
[60] 18 Pa.C.S. § 3701(a)(1)(i)-(iii).
[61] 18 Pa.C.S. § 2702(a)(1),(4).
[62] 18 Pa.C.S. § 907(a).
[63] Notes of Testimony, Sentencing (hereinafter N.T.S.), December 16, 2003, pp. 15-20.

11

On February 22, 1978, the appellant was again involved in another homicide. This murder apparently resulted from an altercation between the appellant and the victim, Donald Childs, who was twenty-seven (27) years old. The appellant chased Mr. Childs out of a recreation center with a handgun, and fired several times at the victim, ultimately causing his death. After a trial on August 25, 1978, the appellant was found guilty of third degree murder and was sentenced to ten (10) to twenty (20) years incarceration.[64]

The appellant was involved in additional violent behavior throughout his life. In 1977, the appellant was involved in another shooting incident. Again, the shooting was gang related. While the appellant claims that he was injured during the exchange, he was ultimately convicted of shooting and paralyzing an individual. The appellant admitted to this conviction during his statement at the hearing.[65] Additionally, while in prison, the appellant was convicted on two occasions of possessing an instrument of crime; one of the incidents apparently involved stabbing a prison guard.[66] While these convictions were not directly related to the "three-strikes" analysis, they provided this Court with additional insight into the appellant's propensity toward violence.

Prior to sentencing, this Court noted its review of the pre-sentence report, as well as the review of the mandatory and discretionary portions of 42 Pa.C.S.A. § 9714. In addition, the Court stated that the nature and circumstances of this offense were "particularly egregious on a number of different levels."[67] The Court commented that the victim had been permanently injured by the appellant's actions, which seemed even more unnecessary in light of the fact that the victim was complying with his demands.[68] The Court remarked that, in its opinion, the

---

[64] N.T.S., December 16, 2003, pp. 21-24.
[65] Id. at p. 75.
[66] Id. at p. 79.
[67] Id. at p. 87.
[68] Id.

12

appellant was a person who, if released from prison, would offend again.[69] The Court found that

the conviction in this matter qualified as a third or subsequent crime of violence. Furthermore,

the Court found that "[t]he public truly can never be fully protected from Mr. Lane."[70] As a

result, this Court imposed a sentence of life imprisonment without parole.[71]

## Discussion

### Life Imprisonment

The appellant was sentenced pursuant to 42 Pa.C.S. § 9714, as a "Three Strikes"

offender. This provision of the Sentencing Code provides in pertinent part:

> Sentences for second and subsequent offenses
> (a) Mandatory sentence.--
> (1) Any person who is convicted in any court of this Commonwealth of a crime of violence shall, if at the time of the commission of the current offense the person had previously been convicted of a crime of violence, be sentenced to a minimum sentence of at least ten years of total confinement, notwithstanding any other provision of this title or other statute to the contrary. Upon a second conviction for a crime of violence, the court shall give the person oral and written notice of the penalties under this section for a third conviction for a crime of violence. Failure to provide such notice shall not render the offender ineligible to be sentenced under paragraph (2).
> (2) Where the person had at the time of the commission of the current offense previously been convicted of two or more such crimes of violence arising from separate criminal transactions, the person shall be sentenced to a minimum sentence of at least 25 years of total confinement, notwithstanding any other provision of this title or other statute to the contrary. Proof that the offender received notice of or otherwise knew or should have known of the penalties under this paragraph shall not be required. <u>Upon conviction for a third or subsequent crime of violence the court may, if it determines that 25 years of total confinement</u>

---

[69] N.T.S., December 16, 2003, pp. 88-89.

[70] Id. at p. 89.

[71] Id. at p. 90.

13

> is insufficient to protect the public safety, sentence the
> offender to life imprisonment without parole.

§ 9714 (emphasis added).

"Crime of violence" includes murder of the third degree. The appellant was previously convicted of two murders "from separate transactions".[72] His current Robbery and Aggravated Assault convictions also qualified as "crimes of violence". See 42 Pa.C.S. § 9714(a). Thus, the appellant is the prototypical "Three Strikes" offender. Commonwealth v. Knowles, 891 A.2d 745, 747 (Pa.Super. 2006)("The purpose of section 9714 is to deter violent criminal acts by imposing harsher penalties on those who commit repeated crimes of violence."). In Commonwealth v. Shiffler, 879 A.2d 185, 195 (Pa. 2005), it was explained that "[t]he point of sentence enhancement is to punish more severely offenders who have persevered in criminal activity despite the theoretically beneficial effects of penal discipline." Id.

The appellant contends that this Court erred "in its application of 42 Pa.C.S. § 9714 and the imposition of a life sentence".[73] It is also alleged that this section is unconstitutional as applied to him "because the factors used to increase the ultimate penalty were not pled nor proven to a jury beyond a reasonable doubt."[74]

The appellant fails to identify in what ways the application of Section 9714, and the imposition of a life sentence to him, were error. It has repeatedly been explained that a 1925(b) statement must be specific enough for the trial court to identify and address the issues to be raised on appeal. Commonwealth v. Hansley, 24 A.3d 410, 415 (Pa.Super. 2011)("[A] [c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all."). See also In re A.B., 63 A.3d

---

[72] The appellant was also convicted of Aggravated Assault relating to the shooting which left the victim paralyzed.
[73] Concise Statement, December 31, 2013, ¶ 9; Concise Statement, June 11, 2014, ¶ 11; Concise Statement, August, 25, 2015, ¶ 14.
[74] Concise Statement, December 31, 2013, ¶ 10; Concise Statement, June 11, 2014, ¶ 12; Concise Statement, August, 25, 2015, ¶ 15.

14

345, 350 (Pa.Super. 2013). It is apparent that the appellant "has demonstrated, through persistent criminal behavior that he [] is not susceptible to the reforming influence of the conviction process." Shiffler, 879 A.2d at 195.

The "Three Strikes" provision is neither unconstitutionally vague nor does it violate the appellant's due process rights. Commonwealth v. Brown, 741 A.2d 726 (Pa.Super. 1999). Likewise, a life sentence does not constitute cruel and unusual punishment. Commonwealth v. Parker, 718 A.2d 1266, 1268 (Pa.Super. 1998)(A constitutional challenge claiming cruel and unusual punishment only arises when there is gross disproportionality between the crime and sentence). Two prior murders among other violent offenses, and the current offense in which the victim suffered permanent injuries, supports the life imprisonment sentence, and any constitutional challenge.

If the appellant is claiming that the Court abused its discretion in imposing a life sentence, this would be a challenge to the discretionary aspects of the sentencing, not the legality of the sentence. Brown, 741 A.2d at 734. The defendant in Brown had two predicate convictions under Section 9714, and the convictions that were appealed included Rape and Attempted Rape. Two consecutive life sentences were imposed after the trial court concluded twenty-five (25) to fifty (50) years of incarceration would not be sufficient to protect the public safety. Id. at 730. In upholding one of the two life sentences, the court noted the following:

> Where the court's sentencing colloquy 'shows consideration of the defendant's circumstances, prior criminal record, personal characteristics and rehabilitative potential, and the record indicates that the court had the benefit of the presentence report, an adequate statement of the reasons for the sentence imposed has been given.'

Id. at 735-36 quoting Commonwealth v. Phillips, 601 A.2d 816, 823-24 (Pa.Super. 1992). The trial court in Brown created an extensive record at the time of sentencing, including a review of

15

the presentence report, consideration of the defendant's behavior, and contemplation of the impact of the crime on the victims, and then imposed the life sentence.

Like the Court in Brown, the appellant was an individual with an extensive background of serious, violent offenses. A comprehensive sentencing hearing was conducted in which irrefutable evidence demonstrated that the appellant had been convicted of murder on two prior occasions.[75] In fact, the appellant ultimately acknowledged the convictions. The Court again heard from the victim and her family regarding the lasting impact of the appellant's actions. In addition, the Court reviewed and relied upon the presentence report. The Court also considered the nature and circumstances of the crime, including (1) that the crime occurred less than two years after the appellant's release from prison, and (2) the especially senseless nature of the violence, in that the victim was complying with the appellant's demands. Ultimately, this Court, as did the trial court in Brown, concluded that twenty-five (25) years was insufficient to protect public safety, and sentenced the defendant to life imprisonment.[76]

It has been previously determined that the appellant's Apprendi[77] challenge to his sentence does not warrant relief. Commonwealth v. Lane, 941 A.2d 34, 36-38 (Pa. 2008). Some discussion regarding Alleyne v. United States, 133 S.Ct. 2151 (2013), however, is warranted in light of appellant's Concise Statements. The Supreme Court in Alleyne held that any fact that increases a mandatory minimum sentence for a crime is an "element" of the crime, not a "sentencing factor", that must be submitted to the fact-finder. However, an exception to this general rule is where the mandatory minimum sentence is affected by a prior conviction. Alleyne, 133 S.Ct. at 2160 n.1. "In Almendarez-Torres v. United States, 523 U.S. 224 [] (1998), we recognized a narrow exception to this general rule for the fact of a prior conviction. Because

---

[75] See N.T.S., December 16, 2003.
[76] Concise Statement, August, 25, 2015, ¶ 17.
[77] Apprendi v. New Jersey, 530 U.S. 466 (2000).

16

the parties do not contest that decision's vitality, we do not revisit it for purposes of our decision today." Id. See also Commonwealth v. Pennybaker, 2015 WL 4549869, *3 (Pa.Super. July 28, 2015)("[A]s the law currently stands, the imposition of a mandatory minimum sentence based on a prior conviction is not unconstitutional."); Commonwealth v. Riggle, 2015 WL 4094427, *3 (Pa.Super. July 7, 2015)("[T]he constitutional jury trial right requires any fact, other than a prior conviction, that triggers a mandatory minimum sentence be proved beyond a reasonable doubt before the finder of fact."); Commonwealth v. Watley, 81 A.3d 108, 117 (Pa.Super. 2013)("The Alleyne decision [] renders those Pennsylvania mandatory minimum sentencing statutes that do not pertain to prior convictions constitutionally infirm insofar as they permit a judge to automatically increase a defendant's sentence based on a preponderance of the evidence standard.")(emphasis added). The appellant's enhancement was based on his prior convictions for murder, and so Alleyne currently does not apply to the within matter. See Watley, 81 A.3d at 117 n. 3.[78]

## Trial Issues

### (a) Forfeiture of Right to Testify

The appellant's behavior from the beginning of the trial to its end was disruptive and obstreperous. His behavior included constant outbursts and an unwillingness to adhere to any courtroom decorum. The appellant was repeatedly warned about his behavior, removed from the courtroom, and permitted to return to the courtroom. All of this was done in an effort to

---

[78] The appellant also raises the allegation that 42 Pa.C.S. § 9714 is unconstitutional because the factors used to increase the mandatory minimum were not pled in the charging documents or proven to a jury beyond a reasonable doubt. Concise Statement, August, 25, 2015, ¶ 16. In Commonwealth v. Hopkins, 117 A.3d 247 (Pa. 2015) citing Alleyne, the Supreme Court held that when a factual determination is necessary for the imposition of a mandatory minimum sentence, the factual determination, as an element of the offense, must be specifically alleged in the charging document, and the defendant has a right to have that fact determined by a jury beyond a reasonable doubt.". Here, the imposition of the mandatory minimum sentence was based on the appellant's prior convictions, and not on a factual determination, so the Commonwealth was not required to allege the fact in the charging documents.

17

provide him with a fair trial. The appellant, however, had other ideas, and did everything in his power to sabotage the completion of the trial. The appellant was not a novice to the courtroom, and his interference with the trial was intentional. Highlights of his disruptive behavior were reviewed earlier in this Opinion.

He now claims that his conduct should not have resulted in a forfeiture of his right to testify.[79] This argument is advanced with full knowledge that appellant's disruptive behavior could not be controlled by any restrictions placed upon him.

A Court faced with a "disruptive, contumacious, [and] stubbornly defiant defendant [] must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." Illinois v. Allen, 397 U.S. 337, 343 (1970). See also State v. Anthony, 860 N.W.2d 10 (Wis. 2015). In Allen, the trial court encountered conduct similar to the appellant's. The defendant in Allen was disorderly and disruptive in both his speech and conduct, making the trial "wholly impossible." Allen, 397 U.S. at 338. The Supreme Court, in recognizing that a criminal trial cannot be held when the courtroom is in "bedlam", reached the following conclusions:

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

Allen, 397 U.S. at 343, 351; see also Commonwealth v. Vega, 719 A.2d 227, 230 (Pa. 1998) (A defendant may waive his right to be present at every stage of the proceedings either expressly or

---

[79] The appellant has modified this claim throughout his original appeal and PCRA proceedings. Concise Statement, December 31, 2013, ¶¶ 5,6; Concise Statement, June 11, 2014, ¶¶7,8; Concise Statement, August, 25, 2015, ¶¶ 10,11.

18

impliedly). The Supreme Court then went on to note three constitutionally permissible ways for a trial court to deal with an obstreperous defendant, including: "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." Allen, 397 U.S. at 344.

This Court ultimately concluded that the appropriate course of action was to remove the appellant when he became disruptive. Unfortunately, despite multiple warnings from the Court and from counsel, the appellant continued to disrupt the proceedings and was removed from the courtroom each day. On the final day of trial, when the appellant most likely would have testified, he became belligerent within fifteen (15) minutes of the commencement of the trial, and had to be removed from the courtroom. He then refused to view or participate in the proceedings from the adjacent room set up for that purpose.

Trial counsel at the PCRA hearing described the appellant as "a major disruptive force in the Courtroom", "[h]e had many outbursts", "it was getting to be impossible to . . . to proceed with him in the Courtroom."[80] The appellant's "threatening manner" required additional security precautions.[81] Counsel also discussed with the appellant that, because of his disruptions, he might lose the right to testify.[82] Ultimately, the appellant did not testify, but trial counsel presented a defense and closed to the jury.

It is not unreasonable to suggest that the appellant's conduct during the trial would have been a precursor to his testimony. On the day that he would have testified, his behavior deteriorated within fifteen (15) minutes. It is doubtful that he could have managed direct and cross-examination without outbursts. Throughout the trial, the appellant's behavior demonstrated an unwillingness to participate except under his terms. He refused every olive

---

[80] Notes of Testimony, PCRA hearing (hereinafter N.T.P.C.R.A.), pp. 24, 30.
[81] N.T.P.C.R.A. at p. 24.
[82] Id. at p. 27.

19

branch offered to him, including a video feed in the adjacent room. Instead, the appellant demanded to be returned to the prison.

A line is reached where a disruptive individual cannot be permitted to adversely affect the administration of justice. Everyone, including counsel, attempted to provide the appellant with a fair trial. As a result, the appellant's inability or unwillingness to testify falls squarely on him. Any assertion that he was ready, willing, and able to testify is contradicted by his behavior over the length and breadth of the trial.

The appellant's misbehavior only left this Court with one option, i.e., his removal from the courtroom and the forfeiture of his right to be present at trial. Allen, 397 U.S. at 343. None of the other options suggested in Allen would facilitate his ability to testify, i.e., binding and gagging. Furthermore, continued removal is warranted if, after warning from the judge, the defendant "insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the Court that his trial cannot be carried on with him in the courtroom." Id. Therefore, by implication, a defendant under those circumstances may forfeit his right to testify.

The right to testify is grounded in the Constitution. Rock v. Arkansas, 483 U.S. 44 (1987); U.S. v. Leggett, 162 F.3d 237, 245 (3d Cir. 1998). However, constitutional rights may be forfeited due to the conduct of the accused. Id. at 246. See also Commonwealth v. Lucarelli, 971 A.2d 1173 (Pa. 2009); Commonwealth v. Kelly, 5 A.3d 370 (Pa.Super. 2010); United States v. McLeod, 53 F.3d 322 (11th Cir. 1995); Bultron v. State, 897 A.2d 758 (Del. 2006); State v. Lehman, 749 N.W.2d 76 (Minn.App. 2008)(collecting cases). In other words, "[t]hrough misconduct, defendants can outright forfeit trial rights as fundamental as the Sixth Amendment right to counsel." Fischetti v. Johnson, 384 F.3d 140, 151 (3d Cir. 2004).

The Supreme Court in Rock also recognized that the right to testify is not without limitation, and may "bow to accommodate other legitimate interests in the criminal trial

20

process." 483 U.S. at 55. Even though the Supreme Court has never directly addressed whether the right to testify may be forfeited, other jurisdictions have done so. In Joyner v. Ercole, 2010 WL 4457711, *3 (E.D.N.Y. November 1, 2010), it was held that "disruptive behavior that allows the right to be present to be forfeited under Illinois v. Allen would also qualify, . . . as a 'legitimate interest' to which the right to testify may bow under Rock v. Arkansas." See also United States v. Ives, 504 F.2d 935 (9th Cir. 1974), vacated on other grounds 421 U.S. 944 (1975), opinion reinstated in relevant part 547 F.2d 1100 (1976)(defendant waived his right to testify with his disruptive conduct); State v. Irvin, 628 S.W.2d 957, 960 (Mo.Ct.App. 1982)("A defendant has no more right to take the stand and 'testify in a way degrading the judicial system than he has to rob a bank or to assault a constable'") quoting Ives, 504 A.2d at 941; See also State v. Mosley, 200 S.W.3d 624, 633 (2006)(collecting cases). In Douglas v. State, 214 P.3d 312 (2009), the Supreme Court of Alaska found, like the within case, that a defendant, by engaging in "disruptive conduct", may forfeit his right to testify as well as his right to be present during his trial. Id. at 322. Furthermore, "Allen does not say that a defendant automatically reclaims the right to be present whenever the defendant promises to behave. Rather, Allen says that the defendant reclaims the right to be present when the defendant 'is willing' to behave." Id. at 323 (emphasis in original). Here, the appellant never even promised to behave when faced with warnings of exclusion from the Courtroom.

Finally, as stated in Ives, 504 F.2d at 941, "just as the right of presence in the courtroom can be waived by the defendant's contumacious conduct, the privilege to testify can also be waived by the defendant's conduct." See State v. Anthony, 860 N.W.2d at 22 ("Surely, the preservation of dignity, order, and decorum in the courtroom constitutes a legitimate interest in the criminal trial process that may outweigh a defendant's right to testify in certain

21

circumstances."). In that regard, while recognizing the right to testify, the Court recognized the trial judge's dilemma when faced with a disruptive defendant:

> There is a delicate balance between allowing an accused to defend himself against a criminal charge and maintaining the necessary decorum in our halls of justice. Obviously, the trial judge must approach this weighty decision with great circumspection. He should distinguish between occasional incidents which cause only slight disruption and those calculated to thwart the entire proceedings. Although occasional disruptions may be annoying to the judge and he may feel that they would prejudice the defendant in the eyes of the jury, the judge should consider, among other things, the gravity of the disruptions, the likelihood of continued disruption and the possibility of violence if the defendant takes the stand. In considering the probability of continued disruption and violence, the judge should not be unmindful of misconduct of the defendant in prior court appearances.

Id. at 942.

Balancing all of the suggested factors, this appellant forfeited his right to testify. In the words of Justice Brennan in his concurring opinion in Illinois v. Allen, "[t]o allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." 397 U.S. at 350.

22

**(b) Photographs of the Victim**

The appellant alleges it was error to allow into evidence "graphic photographs".[83] Multiple photographs were admitted during the course of this three-day trial, including photographs of the scene (inside the store, outside the store, and the surrounding area from which the appellant fled), photographs of the victim's injuries, the photographic array of potential perpetrators that was displayed to the victim and witnesses, photographs of the appellant's car, and photographs of the appellant's clothing. Trial courts have broad discretion concerning the admission of evidence, including the admissibility of photographs. Commonwealth v. Rompilla, 653 A.2d 626, 630 (Pa. 1995); Commonwealth v. Impellizzeri, 661 A.2d 422 (Pa.Super. 1995). "Relevant evidence is that which tends to establish facts in issue or in some degree advances the inquiry and is therefore probative." Id. at 428. The appellant's use of the word "graphic" would seem to limit his claim to the photographs of the victim.

In Commonwealth v. Hatcher, 746 A.2d 1142 (Pa.Super. 2000), in which the Commonwealth introduced photographs that graphically demonstrated wounds suffered by the victim as well as his bloody clothing, the two-step analysis for the admissibility of those photographs was the following:

> First, a court must determine whether the photograph[s are] inflammatory. If not, [they] may be admitted if [they] ha[ve] relevance and can assist the jury's understanding of the facts. If the photograph[s are] inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jury.

746 A.2d at 1143 quoting Commonwealth v. Marinelli, 690 A.2d 203, 216 (Pa. 1997).

---

[83] Concise Statement, December 31, 2013 ¶ 14; Concise Statement, June 11, 2014, ¶ 16; Concise Statement, August, 25, 2015, ¶ 22.

This Court reviewed the photographs of the victim's injuries prior to their introduction and display to the jury. The court noted, first, that the photographs were not inflammatory. They only depicted the hands of the victim, and while there was some blood shown in the photographs, they were not "particularly gruesome" and would not be something that would "frighten jurors."[84] Furthermore, this Court noted that the depiction of the injuries suffered by the victim was essential to the determination of whether serious bodily injury occurred, and potentially could be relevant in evaluating the defendant's state of mind.[85] The photographs admitted at trial were clearly relevant and not at all inflammatory, and as such, this Court did not commit error by admitting them into evidence.

## (c) Appellant's Clothing

The appellant alleges it was error to allow into evidence "trial testimony that indicated that the defendant was incarcerated."[86] The appellant's clothing was secured at the Lehigh County Prison. These items of clothing were issued by the appellant's employer with the name, "Mikal Lake". Testing uncovered the victim's blood on the pants, and so connecting the pants to the appellant was relevant.

A possible stipulation regarding the chain of custody of the clothing was discussed prior to jury selection.[87] If the appellant was willing to stipulate to the chain of custody, there would be no need to "bring out that it was secured from the prison".[88] On the second day of testimony, out of the presence of the jury, the attorneys presented a proposed stipulation to the Court regarding the retrieval of appellant's clothing. However, defense counsel

---

[84] N.T.T., August 12, 2003, p. 91.

[85] Id. at pp. 90-91.

[86] Concise Statement, December 31, 2013 ¶ 11; Concise Statement, June 11, 2014, ¶ 13; Concise Statement, August, 25, 2015, ¶ 19.

[87] N.T.T., August 11, 2003, ¶¶ 11-12.

[88] Id.

24

revealed that, while he believed it was appropriate to enter into the stipulation to avoid mentioning the appellant's incarceration, the appellant objected and directed his attorney not to sign any such stipulation.[89]

Due to appellant's refusal to stipulate to the chain of custody, the Commonwealth was obliged to present the testimony of Deputy Warden James Bloom. Warden Bloom testified regarding how the appellant's clothing was secured at the prison and the retrieval of the clothing for forensic testing.[90]

"[N]o rule in Pennsylvania [] prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." Commonwealth v. Bedford, 50 A.3d 707, 716 (Pa.Super. 2012) quoting Commonwealth v. Johnson, 838 A.2d 663, 680 (Pa. 2003). See also Commonwealth v. Horne, 89 A.3d 277, 284 (Pa.Super. 2014). In this case, the testimony regarding the retrieval of appellant's clothing from the prison was only necessitated by appellant's refusal to enter into the stipulation. "Admission of evidence rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury." Commonwealth v. Jordan, 65 A.3d 318, 325 (Pa. 2013). The victim's blood on the appellant's clothing was extremely relevant. Furthermore, the testimony was limited and did not serve as a "constant reminder" of appellant's incarceration. Johnson, 838 A.2d at 681. The probative value of the testimony outweighed any prejudice, and there was no abuse of discretion by admitting the chain of custody evidence.

---

[89] N.T.T., August 13, 2003, pp. 94-97.
[90] Id. at pp. 161-169.

25

## (d) Religion

The appellant asserts that this Court "erred when it permitted the Commonwealth to introduce evidence of the [appellant's] religion into the trial".[91] The gratuitous interjection of religion into a criminal trial may, in fact, be inappropriate where it serves to form bias and hostility in the minds of the jurors, so as to prevent an objective verdict. Commonwealth v. Hoskins, 403 A.2d 521, 528 (Pa. 1979). However, it is possible that the appellant's religion may be relevant, and thus, admissible. See Commonwealth v. Riggins, 542 A.2d 1004, 1007 (Pa.Super 1988)(The defendant's being a Muslim was relevant with "respect to the identification of the killer" because the victim's dying declaration identified the defendant "as one of her three assailants and stated that all three were Muslims.").

In this case, like Riggins, the fact that the appellant was a Muslim was relevant to the proceedings. During the cross-examination of Investigator Felchock, defense counsel placed considerable emphasis on the name that appeared on the tag in the pants secured from the appellant because the name, "Mikal Lake," differed slightly from the defendant's name.[92] In essence, he was attempting to cast doubt on whether the pants, in fact, belonged to the appellant. Thus, the Commonwealth subsequently asked Investigator Felchock several questions about the appellant's identity. Investigator Felchock testified that the name on the shirt that the appellant was wearing the night he was taken into custody (Mikal) differed from the name that appeared on his driver's license (Michael). He testified that he questioned the appellant about the discrepancy, and that the appellant explained that "Mikal" was his Muslim name.[93] Investigator Felchock testified that the pants that were secured from the appellant bore the name "Mikal," as

---

[91] Concise Statement, December 31, 2013, ¶ 7; Concise Statement, June 11, 2014, ¶ 9; Concise Statement, August, 25, 2015, ¶ 12.

[92] N.T.T., August 13, 2003, p. 145.

[93] Id. at pp. 150-154.

26

well. Furthermore, Investigator Felchock testified that Flexicon, the appellant's employer, had no employee with the name "Mikal Lake," but rather employed "Michael Lane."[94]

The reference to the appellant's religion was minor. Defense counsel highlighted the discrepancy between the name on the clothing and the appellant's name in order to cast some doubt on whether the pants belonged to the appellant. The explanation provided by the appellant was clearly relevant, in light of defense counsel's questions, to further establish ownership of the clothing and did not serve to prejudice the appellant.

### (e) Surveillance Tape

The appellant makes the meritless claim that the surveillance video from the convenience store was "altered or tampered with and violated the best evidence rule".[95] The surveillance camera at the Park Mart depicted the robbery committed by the appellant on June 19, 2002. The tape in its original form was very fast, and so measures were taken to slow down the video to aid in its viewing.[96] The appellant and counsel were given the opportunity to view the tape as edited prior to jury selection.[97] Consequently, during trial, defense counsel stipulated that the tape was an "accurate reproduction of the original", and the jurors were made aware that "we've had to take measures to slow down the VCR in order for the viewing by the jury."[98] Because the tape depicts the crime that was the subject matter of the trial, it was clearly relevant. Furthermore, after viewing the videotape, counsel stipulated as to its authenticity and accuracy. Thus, this Court did not err by admitting the tape into evidence and allowing the jury to view it.

---

[94] N.T.T., August 13, 2003, pp. 154-156.
[95] Concise Statement, December 31, 2013 ¶ 12; Concise Statement, June 11, 2014 ¶ 14; Concise Statement, August, 25, 2015, ¶ 20.
[96] N.T.T., August 12, 2003, p. 82.
[97] N.T.T., August 11, 2003, p. 13.
[98] N.T.T., August 12, 2003, pp. 81-82.

27

Additionally, in Commonwealth v. Jordan, 65 A.3d 318, 328 (Pa. 2013), the admission of a slow motion surveillance video from a Dunkin Donuts, which captured a robbery and murder, like other evidentiary rulings, "rest[ed] within the sound discretion of the trial court". The Supreme Court adopted the following standard:

> In determining whether to admit into evidence slow motion or freeze frame video, the standard to be applied by the trial court is the same as it is for the admission of other evidence. It must be relevant and material and its probative value must outweigh its prejudicial impact.
>
> In a sense, all slow motion and freeze frame video distorts reality . . . . Such distortion may enhance the jury's understanding or it may do the opposite . . . . If the judge concludes that the jury's understanding will be enhanced and that the slow motion or freeze frame is more probative than prejudicial, then the judge should admit the evidence. Of primary relevance is the purpose for which the party offers a slow motion or freeze frame version of a videotape.

Id. quoting Commonwealth v. Hindi, 631 A.2d 1341, 1345 (Pa.Super. 1993).

The surveillance video from the Park Mart assisted the jury in understanding how the robbery unfolded. Furthermore, the jurors were fully informed that the tape was slowed down. In its original format, it was worthless, but slowed down it could assist the jury. Many of the concerns addressed in Jordan or Hindi did not present any potential prejudice to the appellant. There was no abuse of discretion in admitting the Park Mart surveillance tape.

## (f) Interpreter for the Victim

The victim, Bhavna Perikh, testified with the assistance of an interpreter. Her native language was Gujrati, and she was originally from India.[99] She had lived in the United States for thirteen (13) years at the time of the trial. When asked if she understood English, her

---

[99] N.T.T., August 12, 2003, pp. 55-56.

response was "little, little".[100] She believed the use of an interpreter would assist her in understanding the questions asked of her during her testimony.

The appellant does not fully explain how the use of an interpreter denied him the "right to confrontation . . . .",[101] but this Court will attempt to cobble together potential arguments. It is not alleged that the interpreter was related to the victim, nor that the interpreter was not qualified. The interpreter spoke Gujrati, which is a dialect in India and Ms. Perikh's native and primary language. Additionally, the interpreter was sworn as required by Pa.R.E. 604.

Moreover, during the hearing on the appellant's Post-Sentence Motions, David Mussel, one of the District Attorneys associated with the trial, testified that the interpreter was secured by contacting various translation service companies.[102] He testified that the services contacted were selected at random, and the interpreter secured was the only one available at the time he was needed.[103] He noted that the interpreter had one occasion to meet the victim prior to trial, and at that meeting, there was no indication that the two were acquainted, much less related.[104]

The decision to use an interpreter rests in the sound discretion of the trial judge. Commonwealth v. Pana, 364 A.2d 895, 898 (Pa. 1976). The victim in this case expressed a need for the interpreter,[105] the interpreter was qualified to translate the questions of counsel, and was properly administered the appropriate oath. Finally, the interpreter was not related to the victim. There was no abuse of discretion by this Court in permitting the use of an interpreter.

---

[100] N.T.T., August 12, 2003, pp. 55-56.
[101] Concise Statement, June 11, 2014, ¶ 18; Concise Statement, August, 25, 2015, ¶ 24.
[102] Notes of Testimony, Post-Sentence Motions (hereinafter N.T.PSM), May 12, 2004, p. 46.
[103] Id.
[104] Id.
[105] Act No. 172 of 2006 defines "Limited ability to speak and understand English" as follows: "The ability to speak exclusively or primarily a language other than English and the inability to sufficiently speak or understand English". 42 Pa.C.S. § 4402. This Act, which became effective almost three and one-half years after this trial, demonstrates that the use of an interpreter for Ms. Perikh was appropriate.

29

## Jury - Challenge to the Array

The appellant's challenge to the array is premised solely on the race of jurors who were empanelled in this case.[106] In other words, the jury selection process in some manner violated his right to an impartial jury.

To establish a *prima facie* case that the jury selection process violated his Sixth Amendment right to an impartial jury, the appellant was required to demonstrate the following:

> (1) the group allegedly excluded is a distinctive group in the community; (2) representation of this group in the pool from which juries are selected is unfair and unreasonable in relation to the number of such persons in the community; and (3) the under-representation is due to the systematic exclusion of the group in the jury selection process.

Commonwealth v. Romero, 938 A.2d 362, 373-374 (Pa. 2007) quoting Commonwealth v. Lopez, 739 A.2d 485, 495 (Pa. 1999)(citing Duren v. Missouri, 439 U.S. 357, 364 (1979)).

The appellant in Lopez was unable to substantiate his claims with respect to the Lehigh County jury selection system. See also Romero, 938 A.2d at 374; Commonwealth v. Sanchez, 907 A.2d 477, 488 (Pa. 2006). Here, as in Lopez, no statistical proof was presented to demonstrate any discriminatory practices in Lehigh County. In fact, in Romero, it was observed that "Lehigh County's selection method provided a greater number of prospective jurors than were contained in the county's voter registration list . . . ." Romero, 938 A.2d at 374. Moreover, "[d]efendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Commonwealth v. Craver, 688 A.2d 691, 696 (Pa. 1997)(emphasis in original).

---

[106] Concise Statement, December 31, 2013 ¶ 15; Concise Statement, June 11, 2014 ¶ 17; Concise Statement, August, 25, 2015, ¶ 23.

30

The Supreme Court has also "rejected various criminal defendant's attacks, on the basis that African-Americans were underrepresented, to the racial composition of a jury panel drawn from voter registrations lists. More recently, the reasoning and holdings of those cases have been extended to approve the usage of driver's license lists for purposes of jury selection." Commonwealth v. Johnson, 838 A.2d 663, 682 (Pa. 2004)(internal citations omitted); see also Commonwealth v. Estes, 851 A.2d 933, 935 (Pa.Super. 2004); Craver, 688 A.2d at 696; Commonwealth v. Henry, 569 A.2d 929, 933 (Pa. 1990).

Nevertheless, if an appellant intends to object to the racial composition of a jury panel, he is obligated to make the objection in a timely fashion. Specifically, the appellant must challenge the array "not later than 5 days before the first day of the week the case is listed for trial of criminal cases for which the jurors have been summoned and not thereafter . . . . " Pa.R.Crim.P. 630(B)(1); see Commonwealth v. Davis, 406 A.2d 1087, 1089 (Pa.Super. 1979). The appellant waited until the day of jury selection to raise this issue, but as noted earlier, had no evidence to substantiate his claim. Because there is no evidence of discriminatory practice in Lehigh County's jury pool selection process, and because the appellant failed to make a timely objection, this Court's denial of his challenge to the potential jury array was proper.

## Recusal

The appellant alleges recusal was warranted because of "prejudicial animus" towards him.[107] The appellant, in his original 1925(b) Statement filed in 2004, complained that his trial counsel refused to file a recusal motion. Trial counsel did indicate that the appellant wanted him to do so, but counsel disagreed with him.

---

[107] Concise Statement, December 31, 2013, ¶ 13; Concise Statement, June 11, 2014, ¶ 15; Concise Statement, August, 25, 2015, ¶ 21.

Throughout the proceedings, the appellant's disrespectful and out-of-control behavior displayed hostility toward this Court. By contrast, there was no hostility or "animus" displayed towards the appellant.

"It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion." Commonwealth v. Abu-Jamal, 720 A.2d 79, 89 (Pa. 1998)(internal citations omitted). "This Court presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice." Commonwealth v. Whitmore, 912 A.2d 827, 834 (Pa. 2006)

The appellant made a recusal request at the beginning of the trial based upon a statement he attributed to this Court that it would be "treated . . . as a murder case".[108] The appellant's recollection was incorrect. What was said was that this was a serious case "because the ramifications in this case are potentially great to Mr. Lane".[109] Such a statement fails to

---

[108] N.T.T., August 11, 2003, p. 3.
[109] Id. at p. 4.

32

establish bias, prejudice, or unfairness, but instead, an understandable concern for protecting the appellant's rights.

For all the foregoing reasons, the judgment of sentence should be affirmed.[110]

---

[110] The appellant also makes two additional allegations which are vague and subject to waiver analysis. Commonwealth v. Hansley, 24 A.3d 410, 415 (Pa.Super. 2011); In re A.B., 63 A.3d 345, 350 (Pa.Super. 2012). It is alleged that the trial court erred in allowing the Commonwealth to present evidence "which was tampered with by the Commonwealth prior to trial". Concise Statement, December 31, 2013, ¶ 12; Concise Statement, June 11, 2014, ¶ 19; Concise Statement, August, 25, 2015, ¶ 25. If this claim pertains to the surveillance tape, it has already been addressed. The appellant's original post-sentence motion, amended post-sentence motions, and "Amended Petition For Relief Pursuant To The Post-Conviction Relief Act" mention this issue in the context of the surveillance tape. Issues not raised in the lower court are waived. Commonwealth v. Watson, 835 A.2d 786, 791 (Pa.Super. 2003)(Issues not raised in the lower court are waived and cannot be raised for the first time on appeal and thus waiver cannot be rectified by "proffering it in response to a Rule 1925(b) order"). See also Commonwealth v. Melendez-Rodriguez, 856 A.2d 1278, 1287 (Pa.Super. 2004).

The appellant's final contention that trial counsel was not acting in his best interest, and that the trial court should have replaced him, is a spurious claim. Concise Statement, December 31, 2013, ¶ 8; Concise Statement, June 11, 2014, ¶ 10; Concise Statement, August, 25, 2015, ¶ 13. It was the appellant's conduct which erected obstacles to counsel's representation. This vague allegation ignores the requirement that when counsel is appointed "a motion for change of counsel . . . shall not be granted except for substantial reasons". Pa.R.Crim.P. 122(c). See Commonwealth v. Keaton, 45 A.3d 1050, 1070-1071 (Pa. 2012)(Trial judge did not abuse his discretion in denying motion for change of court-appointed trial counsel based on claim that counsel did not have his best interest at heart); Commonwealth v. Wright, 961 A.2d 119, 134 (Pa. 2008)(Appellant failed to demonstrate irreconcilable differences between counsel and client and any communication breakdowns were due to appellant's lack of cooperation and refusal to follow counsel's advice). Here, a "Motion For Withdrawal of Counsel" was filed by the appellant on July 18, 2003, which was less than a month prior to trial. No irreconcilable differences were alleged, only that counsel failed to show him the surveillance video. The appellant's contention that counsel was not acting in his best interests is, at best, an abstract claim. It is doubtful that any counsel could have represented the appellant without developing angina, but that does not mean that counsel was not representing the appellant zealously. Pretrial motions were litigated, an investigator was hired, and a reasonable strategy to contest the identification was employed. This claim is without merit.